(Slip Opinion)

# Whether the Posse Comitatus Act Prohibits Military Personnel from Making Arrests Outside, but Within the "Immediate Vicinity" of, a National Defense Area for Crimes Committed Within that National Defense Area

The Posse Comitatus Act does not prohibit military personnel from making arrests outside of a National Defense Area for crimes committed within that National Defense Area.

August 14, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF WAR

Like most military installations, National Defense Areas ("NDAs") are closed to the civilian public, and unauthorized access is prohibited. *See National Defense Areas*, U.S. Northern Command, https://perma.cc/6MXA-FYPH (last accessed June 25, 2026) ("*National Defense Areas*"); *see also* Dep't of Defense Instruction 5200.08, para. 3 (Nov. 20, 2015) ("DoDI") (establishing requirements for accessing military reservations). Still, some civilians, including illegal immigrants coming across the southern border, have ignored these restrictions and have continued to pass through NDAs without authorization and in violation of criminal trespass laws. You have asked us whether the Posse Comitatus Act ("PCA"), 18 U.S.C. § 1385, would prohibit military personnel from arresting civilians who violate criminal law by trespassing through an NDA but leave the NDA's boundaries before they can be detained and transferred to civilian authorities. *See* E-mail for T. Elliot Gaiser, Assistant Attorney General, Office of Legal Counsel, from Earl G. Matthews, General Counsel, Department of War, *Re: FW: NDA-Pursuit* (Apr. 20, 2026, 1:04 PM) ("E-mail Request"). It does not.

Our analysis has four parts. *First*, we provide a brief overview of the relevant facts and the PCA. *Second*, we explain that the PCA does not prohibit military personnel from engaging in law-enforcement activities within military reservations. *Third*, we conclude that when the law is violated within a military reservation, the same underlying rationale permits military personnel to engage in at least some law-enforcement activities outside of that military reservation. *Fourth*, we address potential counterarguments.

1

## I.

### A.

In his efforts to strengthen immigration enforcement along the southern border, the President issued Executive Order 14167, "Clarifying the Military's Role in Protecting the Territorial Integrity of the United States," to "prioritize the protection of the sovereignty and territorial integrity of the United States along our national borders." Exec. Order No. 14167, 90 Fed. Reg. 8613, 8613 (Jan. 20, 2025). Later, the President directed the military to "take a more direct role in securing our southern border." Memorandum for the Secretary of Defense et al., from the President, NSPM-4, *Military Mission for Sealing the Southern Border of the United States and Repelling Invasions* (Apr. 11, 2025).

In that later directive, the President directed the Secretaries of War, the Interior, Agriculture, and Homeland Security "to accomplish the military missions described in Executive Order 14167, and to ensure the safety and security of the military and other Federal personnel in areas of military operations within Federal lands along the southern border" by, among other things, establishing "National Defense Areas" under the control and jurisdiction of the Department of War. *Id.* Further, he directed the Secretary of War to "determine those military activities that are reasonably necessary and appropriate to . . . protect and maintain the security of military installations, consistent with section 2672 of title 10, United States Code, and the longstanding authority of a military installation commander to exclude persons from a military installation, as recognized in section 21 of the Internal Security Act of 1950 (50 U.S.C. 797) and 18 U.S.C. 1382." *Id.*

Since the President issued these directives, six NDAs have been established in California, Arizona, New Mexico, and Texas. *See, e.g.*, *Enhanced Authorities in the New Mexico National Defense Area*, U.S. Northern Command (Apr. 21, 2025), https://perma.cc/67EZ-XLMC; *National Defense Area Established in South Texas*, Air Force (June 25,2025), https://perma.cc/RJ54-LAVM; *National Defense Areas Expanded, Established Along Texas Border*, Air Force (Feb. 6, 2026), https://perma.cc/GD9C-GGQ8. Each of these NDAs is controlled and administered by a preexisting military reservation, including U.S. Army Fort Huachuca, U.S. Army Fort Bliss, Joint Base San Antonio, Marine Corps Air Station Yuma, and Naval Air Facility El Centro. *See National*

*Defense Areas*. U.S. Northern Command has indicated that it may establish additional NDAs in the future. *See id.*[1]

You have asked whether military personnel may pursue individuals who trespass on an NDA even after such individuals leave the NDA, arrest them beyond the NDA's boundaries, and transfer them to the appropriate civilian law-enforcement officers. Specifically, you asked us to assume that the alleged trespassers "would be in the immediate vicinity of the NDA," and that they would have "le[ft] the NDA reservation just before military members [could] catch up with them and detain them for arrest by [civilian] law enforcement." E-mail Request. We express no opinion on whether or how this opinion would apply if the arrests occurred at a time and place far removed from the initial trespass.[2]

### B.

The PCA generally prohibits the use of the military "as a posse comitatus or otherwise to execute the laws." 18 U.S.C. § 1385; *see also Military*

---

[1] The mechanisms used to establish the six current NDAs vary, but each was formed from property already owned or controlled by the federal government. For some, the Department of the Interior executed an "emergency withdrawal" of public land that was then transferred to the administrative jurisdiction of the military. *See* 43 U.S.C. § 1714(e); *see also* Public Land Order No. 7963; National Defense Operating Area Withdrawal, Dona Ana, Luna, and Hidalgo Counties, NM, 90 Fed. Reg. 16,698 (Apr. 21, 2025). For others, land was temporarily transferred from the U.S. section of the International Boundary and Water Commission to the military's administrative control. *See* 40 U.S.C. § 521 *et seq.* Consistent with our Office's longstanding policy against providing advice regarding past events, we assume for the purposes of answering your question that this was done in compliance with all applicable laws and regulations. Once validly under the military's administrative control, an NDA is subject to DoDI 5200.08, which governs the security of military installations, and to the security regulations of the respective military branch. *See* DoDI 5200.08; *see also, e.g.*, Army Reg. 190-13 (June 27, 2019) (implementing DoDI 5200.08 and establishing the "Army Physical Security Program"); *see also id.* § 6-3(a) ("Commanders and directors of installations . . . will designate them[] in writing as restricted areas.").

[2] In preparing this opinion, we assume that military personnel would have probable cause to arrest those impermissibly crossing an NDA's boundaries. *See* 18 U.S.C. § 1382 (prohibiting "go[ing] upon" a military reservation "for any purpose prohibited by law or lawful regulation"); 50 U.S.C. § 797(a) (prohibiting the violation of "any defense property security regulation"). We do not otherwise opine on that issue because of the fact-intensive nature of a probable-cause inquiry, which "depends on the totality of the circumstances" of each case. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

*Support for Customs and Border Protection Along the Southern Border Under the Posse Comitatus Act*, 45 Op. O.L.C. __, at *3 (Jan. 19, 2021) ("*Southern Border*"). Criminal liability attaches to "[w]hoever . . . willfully uses" the listed military branches as a posse comitatus. 18 U.S.C. § 1385. So, although the statute prohibits certain military activities, its criminal punishments are directed at those who "willfully use[]" the military for prohibited purposes, rather than at the military actors themselves.[3] *Id.*; *see Bryan v. United States*, 524 U.S. 184, 191–92 (1998) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" (citation omitted)). This structure reflects that by enacting the PCA in 1878, Congress sought to end the then-common practice of civilian law enforcement officials calling upon the U.S. Army to assist with the enforcement of civilian laws. *See Southern Border* at *3 (describing the early American practice). The PCA thus generally precludes "military personnel [from] applying force to the civilian community in the normal course of civil government" and prevents "actual or threatened coercion by persons subject to military discipline on behalf of civil law enforcement officers." Letter for Deanne Siemer, General Counsel, Department of Defense, from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel at 5 (Mar. 24, 1978).

The PCA recognizes some exceptions, however, two of which are relevant here. *First*, our Office and the courts have consistently recognized that the PCA "does not prohibit military involvement in actions that are primarily military or foreign affairs related, even if they have an incidental effect on law enforcement, provided that such actions are not undertaken for the purpose of executing the laws." *Application of the Posse Comitatus Act to Assistance to the United States National Central Bureau*, 13 Op. O.L.C. 195, 197 (1989); *see also* DoDI 3025.21, encl. 3, para. 1(b)(1) (Feb. 8, 2019); *Applewhite v. U.S. Air Force*, 995 F.2d 997,

---

[3] Determining who "uses" the military in the relevant sense would depend on who in the chain of command made the decision to instruct military personnel to engage in the law-enforcement action. *See Smith v. United States*, 508 U.S. 223, 229 (1993) (citing dictionaries and past precedent to define the ordinary meaning of "use" as "to make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of" and "to derive service from" (cleaned up)). This is a factbound determination upon which you have not asked us to opine.

1001 (10th Cir. 1993). Heartland examples of actions that have a "military purpose" unrelated to ordinary civilian law enforcement, *United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000), include the investigation of legal violations committed by military personnel or on a military installation, Jennifer K. Elsea, Cong. Rsch. Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* at 49–51 (updated Nov. 6, 2018) ("CRS, *Posse Comitatus Act*").

*Second,* the military may engage in law enforcement in "cases and under circumstances expressly authorized by the Constitution or Act of Congress." 18 U.S.C. § 1385. Congress has relied on this exception to the PCA to expressly authorize various law-enforcement activities. *See* CRS, *Posse Comitatus Act* at 31–49. Thus, the PCA does not apply if the relevant law-enforcement activity is authorized by another statute.

## II.

Under the military-purpose and statutory-authorization exceptions alike, military personnel may engage in law-enforcement activities relating to on-installation violations of civilian law. Although these exceptions are interrelated as applied to your inquiry, each independently justifies the use of military personnel to enforce the law within a military installation.

## A.

"Historically, the commander of the military installation has had both the responsibility and the authority to maintain law and order" within the military installation under his command. *Use of Military Personnel to Maintain Order Among Cuban Parolees on Military Bases*, 4B Op. O.L.C. 643, 644 (1980) ("*Cuban Parolees*"). When military personnel exercise this traditional authority to enforce the law within a military installation, it falls within the PCA's "military purpose" exception. *See* Memorandum for William P. Tyson, Acting Director, Executive Office for U.S. Attorneys, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Use of JAG Officers to Prosecute Petty Offenses on Military Reservations* at 4–5 (Nov. 19, 1979). In other words, because enforcing federal trespass laws such as sections 1382 and 797 serves the "military purpose" of "preserv[ing] order" *within* the military installation, it is not prohibited by the PCA. *Id.* at 4.

This inherent authority over military installations has been recognized by all three branches of government. As far back as 1837, Attorney General Benjamin Franklin Butler explained that a military commander "has a general authority to prevent any person within [the reservation's] limits from interrupting its discipline, or obstructing in any way the performance of the duties assigned by law to the officers," and that violators "must be considered as wrongdoers; and the commandant will have a right to take such measures as may be necessary to protect the interests of the establishment." *Rights of Residents & Visiters* [sic] *at the Military Academy*, 3 Op. Att'y Gen. 268, 272 (1837). Our Office has described this authority as being "derive[d] . . . from the President's constitutional power as Commander-in-Chief" and "perform[ed by the installation commanders] . . . on behalf of the President, on their respective bases." *Cuban Parolees*, 4B Op. O.L.C. at 644 & n.3. We also observed that "Congress has implicitly recognized the existence of this authority in two criminal statutes": sections 1382 and 797. *Id.* at 644. And because of "[t]he essential and obvious interest of the military in the security of persons and of property on the military enclave," the Supreme Court has similarly recognized both "[t]he responsibility of the military commander for maintenance of order in his command and his authority to maintain that order." *Relford v. Commandant*, 401 U.S. 355, 367 (1971); *see also Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 893 (1961) (referring to this authority as "historically unquestioned").

Federal circuit courts confronted with this issue have reached the same conclusion: The PCA does not prohibit military personnel from enforcing the law within a military installation. For example, in *United States v. Banks*, military personnel arrested a civilian and charged him with violating federal drug laws. 539 F.2d 14, 15 (9th Cir. 1976). The civilian defendant argued that "using the military to enforce the civil laws is prohibited by the [PCA]." *Id.* at 15–16. The Ninth Circuit distinguished other PCA cases because they "applied only to the off-base use of military personnel by civilian authorities" and held that "the Act does not prohibit military personnel from acting upon on-base violations committed by civilians." *Id.* at 16. In *United States v. Griley*, a civilian defendant argued that "the search of his Fort Meade home by an FBI special agent and a military investigator" violated the PCA. 814 F.2d 967, 976 (4th Cir. 1987). The Fourth Circuit rejected his challenge and agreed with the

Ninth Circuit that "[i]t is well settled that military investigators may look into violations of civil law that occur on military bases or within military operations." *Id.* (citation omitted). In sum, "the military purpose exception" to the PCA "sanction[s] military assistance in law enforcement activities . . . where civilians committed illegal acts on military bases." *Chon*, 210 F.3d at 994.

We stand by our decision in *Cuban Parolees* that the PCA does not prohibit military personnel from "apprehend[ing] and restrain[ing] [civilians] for on-base violations of federal and state law," such as sections 1382 and 797, "which in the base commander's view threaten the security and good order of the" NDAs. *Cuban Parolees*, 4B Op. O.L.C. at 647; *see also United States v. Apel*, 571 U.S. 359, 373 (2014) (concluding that "[w]here a place with a defined boundary is under the administration of a military department, the limits of the 'military installation' for purposes of [18 U.S.C.] § 1382 are coterminous with the commanding officer's area of responsibility"). The Supreme Court has recognized that "a crime committed against a person or property on a military base" has an "adverse effect . . . upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission," because it "violat[es] the base's very security." *Relford*, 401 U.S. at 367. Thus, the PCA does not prohibit military personnel from acting against trespassers "who, by committing crimes, are a threat to military or other federal property or to the good order and discipline of the base." *Cuban Parolees*, 4B Op. O.L.C. at 646.

## B.

As mentioned above, Congress has also created statutory exceptions to the PCA bar on the military conducting law-enforcement activities. *See* CRS, *Posse Comitatus Act* at 31–49. Some well-known exceptions include the Insurrection Act, *see* 10 U.S.C. §§ 251–255, and the authorization to assist with certain drug-crime enforcement, *see id.* §§ 271–284. With respect to protecting military reservations such as the NDAs, Congress expressly provided under section 2672 that military personnel may enforce federal law. *See id.* § 2672(c)(1), (h).

Enacted in 2015, section 2672 requires the Secretary of War to "protect the buildings, grounds, and property that are under the jurisdiction, custo-

dy, or control" of his Department. *Id.* § 2672(a). To do so, he may, subject to certain conditions, "designate military or civilian personnel of the Department of [War] as officers and agents." *Id.* § 2672(b)(1). These designations "may be made by individual, by position, by installation, or by such other category of personnel as the Secretary determines appropriate." *Id.* § 2672(b)(2). Either the Secretary or the Deputy Secretary of War may make these designations. *Id.* § 2672(e).

Once designated, military or civilian officers may "enforce Federal laws and regulations for the protection of persons and property," including by "mak[ing] arrests."[4] *Id.* § 2672(c)(1), (3).[5] The Secretary must first "determine[]," however, that (1) "the exercise of [these] specific authorit[ies] . . . is necessary for the performance of the duties of the [designated] personnel"; (2) "such duties cannot be performed as effectively without such authorities"; and (3) "the necessary and proper training for the authorities to be exercised is available to the [designated] personnel." *Id.* § 2672(b)(4). If these statutory conditions are satisfied, section 2672 "expressly authorize[s]" military personnel to execute federal law, *see* 18 U.S.C. § 1385, including by making arrests, in the context of protecting "buildings, grounds, and property" under military "jurisdiction, custody, or control," 10 U.S.C. § 2672(a). Although no court has yet construed section 2672, we have no reason to doubt that the NDAs are "grounds" or "property" that are currently under the military's "jurisdiction, custody, or control."[6] *Id.* Thus, if the designation process set out in subsection 2672(b) is followed, military personnel may arrest individuals for violating federal laws—such as sections 1382 or 797—to protect the military's "grounds" or "property" without violating the PCA. *Id.*

---

[4] The statute states that "[a] person who is arrested pursuant to [section 2672] . . . may not be held in a military confinement facility," and so would require immediate transfer to civilian authorities. 10 U.S.C. § 2672(f).

[5] The authority delegated to designated officers under section 2672 must be "exercised in accordance with guidelines approved by the Attorney General." 10 U.S.C. § 2672(i).

[6] Section 2672 does not define these terms, so they carry their "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). As the NDAs are administered by preexisting military bases, they would seem to fall squarely within the military's "control" or "jurisdiction." *See Webster's Third New International Dictionary* 496 (2002 ed.) (defining "control" as "power or authority to . . . manage"); *id.* at 1227 (defining "jurisdiction" to include the "power or right to exercise authority").

## III.

The authorities discussed above conclusively resolve the question of whether military officers may, consistent with the PCA, arrest civilians for legal violations committed on military installations. The answer is yes. We next consider whether that conclusion holds true for on-base violations if the arrest takes place just outside of the military installation. We conclude that the answer is the same.

As far as we are aware, there have only been two prosecutions for violations of the PCA, neither of which provides much guidance.[7] The extant authorities on the application of the PCA outside of a military installation are circuit court cases in which defendants relied on the PCA to argue for the suppression of evidence. In those cases, the courts have generally recognized the military-purpose exception to the PCA. For example, in *Applewhite v. U.S. Air Force*, the Tenth Circuit held that military personnel did not violate the PCA when they performed a drug "sting" on a servicemember and also arrested his civilian wife (who was found to be "a participant" in the drugs purchase and about whom they quickly contacted the civilian authorities to hand over custody). 995 F.2d at 1000–01. The court found no PCA violation even though the arrest took place off-base. *See id.* at 1001. The court observed that after arresting the servicemember, which served the "military purpose" of "preventing illicit drug transactions by active duty military personnel," "it was objectively reasonable for the agents to detain the [wife] somewhere long enough to inquire as to whether civilian authorities had any interest in taking over any prosecution," given the evidence that she was a participant in her husband's crime. *Id.* What is more, the court concluded that "[i]n these circumstances, the agents could hardly have justified her immediate release just because she was a civilian." *Id.* Thus, even though the arrest took place off-base, it did not violate the PCA because it only occurred pursuant to the military's legitimate interest in maintaining good order and discipline.

The same was true in *United States v. Chon*, where civilians broke into a naval installation and "stole two flatbed trucks, spools of copper wire, and other military equipment." 210 F.3d at 992. Naval Criminal Investiga-

---

[7] Both prosecutions occurred in 1879, both defendants were Army officers, and although there is some dispute, it seems most likely that both were acquitted. *See* CRS, *Posse Comitatus Act* at 66 & n.442.

tion Services ("NCIS") officers[8] conducted interviews, searches, "two photographic lineups," and other investigative activities—all off-base—that ultimately resulted in the recovery of the stolen property and a confession from the perpetrators. *Id.* Yet the Ninth Circuit held that these law-enforcement activities "were permissible because there was an independent military purpose for the[] investigation—the protection of military equipment." *Id.* at 994. It expressly invoked "the military purpose exception," which the court said applies "where civilians committed illegal acts on military bases," even though the challenged law-enforcement actions took place off-base. *Id.*

And in *United States v. Hitchcock*, Army Criminal Investigation Division and NCIS officers investigated a civilian drug dealer who supplied drugs to a military base. 286 F.3d 1064, 1066 (9th Cir. 2002). These military investigators conducted surveillance, participated in the search of the civilian defendant's home, and seized evidence of drug-dealing. *Id.* The Ninth Circuit rejected a PCA challenge to these off-base law-enforcement activities "because the military's involvement in this case falls within the 'independent military purpose' exception." *Id.* at 1070. Indeed, the court described as "unassailable" the conclusion that "the sale of LSD to persons who might use the drug on a military base or sell it to others on the base implicates the maintenance of law and order on a military installation" and therefore satisfies the "military purpose" exception. *Id.*[9]

Applying the reasoning of *Applewhite*, *Chon*, and *Hitchcock*, we conclude that it would not violate the PCA for military personnel to arrest those who violate sections 1382 and 797 by traversing an NDA without authorization, even if the arrest takes place just beyond the NDA's borders. An arrest of a fleeing suspect that takes place just outside of the NDA serves the same "military purpose" as an arrest within the NDA,

---

[8] In *Chon*, the government argued that NCIS officers were not covered by the PCA because "most of its agents are civilians" and the NCIS "is headed by a civilian director with a civilian chain of command." 210 F.3d at 993–94. The Ninth Circuit rejected these arguments and held that "the NCIS is bound" by "PCA-like restrictions." *Id.*

[9] *See also Kenny v. Easley*, 166 F. App'x 898, 901 (9th Cir. 2006) (holding that military officers did not violate the PCA by detaining a civilian and "preventing [him] from driving under the influence," as his detention served the "military purpose" of "ensur[ing] the safety of the [military installation] and the public at large").

*Applewhite*, 995 F.2d at 1001: protecting property that is under the jurisdiction, custody, or control of the military, *see* 10 U.S.C. § 2672(a), and maintaining "the security and good order of the base," *Cuban Parolees*, 4B Op. O.L.C. at 647. Because the "military purpose" is wholly independent of general civilian law enforcement, an arrest under the circumstances you have described would not violate the PCA. *See Applewhite*, 995 F.2d at 1001.

### IV.

We have identified three potential counterarguments. *First*, some might argue that section 2672 does not permit military personnel to engage in off-base protective activities. *Second*, because NDAs are often vast expanses of empty land, others might claim that there is no "independent military purpose" in protecting them against civilian trespassers. *Chon*, 210 F.3d at 994. And *third*, our conclusion might raise concerns that we have identified no limiting principle on using the military to enforce immigration laws, which could pose a concern if policymakers chose to push the logic of our opinion to its fullest extent. None of these arguments changes our conclusion; we address each in turn.

### A.

We acknowledge that section 2672 distinguishes between the use of military and civilian personnel to protect military property. For example, the statute says that "with regard to *civilian* officers and agents," the Secretary of War may assign "duty in areas outside the [military] property . . . to the extent necessary to protect that property and persons on that property." 10 U.S.C. § 2672(b)(1) (emphasis added). The statute also requires that, "[i]n the case of *civilian* personnel," the Secretary of War must specify which authorities, "if any, . . . are authorized to be exercised *outside* the [military] property." *Id.* § 2672(b)(3)(C)(i) (emphases added). Further, the Secretary of War "may enter into agreements with Federal agencies and with State, Indian tribal, and local governments to obtain authority for *civilian* officers and agents . . . to enforce Federal laws and State, Indian tribal, and local laws concurrently with other . . . law enforcement officers." *Id.* § 2672(h) (emphasis added). In sum, it is possible to read section 2672 as restricting the exercise of off-base protective authority to civilian officers only.

In our view, however, section 2672 does not preclude military personnel from taking certain off-base actions for two reasons. *First*, we read section 2672 as limiting only the Secretary's ability to designate certain stations of "duty." 10 U.S.C. § 2672(b)(1). For example, we would agree that, under the plain terms of the statute, the Secretary could not permissibly assign military personnel to serve in a primarily off-base protective assignment. *Id.* That conclusion does not mean, however, that a military officer who is fulfilling his *on-base* protective duties may not pass briefly off-base to apprehend someone who committed an on-base violation and who is evading arrest. For example, if a military officer with an on-base protective assignment spotted an arsonist attempting to set fire to military property, that officer could reasonably pursue and detain the arsonist, even if the arsonist managed to cross the NDA's boundary line just before his arrest. In other words, although the statute may limit off-base "duty" assignments to civilian officers, *id.*, we do not read it as prohibiting all off-base protective activities by military officers who are fulfilling on-base assignments.[10]

*Second*, the statute states that "[n]othing in this section shall be construed" to "restrict any other authority of the Secretary of [War] or the Secretary of a military department." *Id.* § 2672(*l*). As discussed above, there is a long and independent historical tradition of military officers exercising protective power over military reservations. *See* Part II.B; *Cuban Parolees*, 4B Op. O.L.C. at 644–45. And as discussed above, we conclude that this tradition independently authorizes some off-base enforcement activities based on on-base legal violations. *See* Part III. Or in other words, even in the absence of section 2672, the traditional protective authority would justify some off-base enforcement activities, as described

---

[10] For much the same reason, we do not think that the statute's requirement that the "authorities . . . authorized to be exercised outside the property" must be specifically described for "civilian personnel" implicitly prohibits military personnel from exercising delegated authority outside of a military reservation. 10 U.S.C. § 2672(b)(3)(C)(i). When viewed in the context of its neighbor, which concerns "coordination with law enforcement officials outside of the Department of [War]," *id.* § 2672(b)(3)(C)(ii), this provision merely sets limits on the use of civilian personnel outside of a military reservation, precisely because other traditional civilian law enforcement may be readily available. It says nothing about the exercise of authority by military personnel fulfilling on-base protective assignments who may occasionally need to pass briefly beyond the boundary to effectively fulfill those assignments.

above. And based on this express statutory reservation, nothing in section 2672 should be construed as limiting or prohibiting the exercise of this traditional and independent authority.

## B.

It is our understanding that some NDAs consist primarily of vast swaths of unoccupied land with some minimal signage. Thus, one could argue that such NDAs are "military property" in name only. If that were the case, trespassers would not "threaten the security and good order of the base," *Cuban Parolees*, 4B Op. O.L.C. at 647, and arresting them would serve no "military purpose," *Applewhite*, 995 F.2d at 1001. So, the argument goes, military personnel would still violate the PCA because they would effectively be acting as civilian law enforcement officers, given the thin military nexus.

We reject this argument for three reasons. *First*, the statutory requirements of section 2672 are exceedingly broad: "The Secretary of Defense *shall* protect the buildings, grounds, and property that are under the jurisdiction, custody, or control of the Department." 10 U.S.C. § 2672(a) (emphasis added). The statute imposes no separate, independent-military-nexus requirement, and as we understand the relevant facts, the NDAs are under the Department's "jurisdiction, custody, or control." *Id.* Viewed together with the criminal-trespass provision, 18 U.S.C. § 1382, it is evident that Congress has made the relevant policy decision that military reservations, including NDAs, ought to be protected.[11] The Secretary is in no position to make a contrary determination just because the land is unoccupied. Thus, section 2672 permits the law-enforcement actions described above, independent of any specific military nexus.

*Second*, with respect to the protective power over military installations, we have previously declined to draw lines within a military installation based on a military nexus. For example, in *Cuban Parolees*, the parolees

---

[11] Once a trespasser has left an NDA, one could argue that the military reservation is no longer under threat, and thus that no arrest is needed to protect it. This argument overlooks the significant deterrent function that an arrest has on future trespassers. Indeed, accepting such an argument would merely incent future trespassers to pass more quickly and surreptitiously through NDAs in the hopes of making it beyond the boundary and outside of the arresting officer's grasp. We reject this argument as short-sighted and find it inconsistent with the Secretary's statutory duty under section 2672.

had been limited to areas "set aside" and "cordoned off" from the rest of the base. *Cuban Parolees*, 4B Op. O.L.C. at 643. Still, we concluded that "military personnel may take any steps deemed by the base commander to be reasonably necessary to ensure that the Cuban parolees do not breach the peace of the base, *even where disturbances are confined to the area to which the parolees are restricted*." *Id.* at 647 (emphasis added). Although the parolees were explicitly limited to a non-military area of the installation, in other words, the PCA did not limit the use of military personnel for law-enforcement purposes on land subject to military control. *Id.*; *cf. Relford*, 401 U.S. at 369 (noting an "inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas"). As in *Cuban Parolees*, we decline here to engage in such a line-drawing exercise within the NDAs.

*Third*, even if there were a military-nexus requirement, we have no doubt that there is a military need to protect the NDAs in their entirety. Even though substantial portions of the NDAs may be presently unoccupied or have no standing structures on them, there is a military necessity to ensure that unauthorized persons are not establishing a position to monitor the activities of U.S. forces for intelligence-gathering purposes or conducting reconnaissance in preparation for a terrorist attack.[12] Individuals may also be drawn to remote and unoccupied locations to engage in criminal activity, which poses a threat to military personnel who may come upon them in the course of their duties or where the activity itself poses a danger, such as the operation of methamphetamine laboratories.[13] As there is no way for military personnel to know *a priori* the identity or intent of an unauthorized person, there is a military purpose in apprehending, at least temporarily, anyone whose presence is unauthorized, in order to ensure appropriate measures can be taken to protect national security and the safety of military personnel. That military purpose continues even if the trespassers have exited the installation before they were apprehended.

---

[12] *See, e.g.*, Letter for Lloyd Austin, Secretary of Defense, and Christopher Wray, Director, Federal Bureau of Investigation, from Representative James Comer, Chairman, House Committee on Oversight and Accountability (Oct. 2, 2023); Eric Pilgrim, *Army Officials: Military Installations Are a No-Fly Zone for Unauthorized Drones*, U.S. Army (June 6, 2022), https://perma.cc/C2Y6-93ZW.

[13] *See, e.g.*, *Hazardous Materials: Clandestine Drug Labs*, U.S. Army Fort Knox, https://perma.cc/TYU5-4KES (last accessed June 26, 2026).

**C.**

Finally, we note that this opinion does not give the military free license to enforce civil law, even though the military has broad discretion to protect NDAs from trespassers. There are limits on the establishment of an NDA, which come not from the PCA but from other sources of law. Those limits are both statutory, *see, e.g.*, 43 U.S.C. § 1714(e), and constitutional, *see* U.S. Const. amend. V. And Congress may impose additional limits through ordinary legislation, *see, e.g.*, *id.* art. I, § 8, cls. 12–14, as well as the appropriations process, *see, e.g.*, *Application of 10 U.S.C. § 191 and Section 8044 of Pub. L. No. 118-47 to the Defense Innovation Unit and Strategic Capabilities Office*, 50 Op. O.L.C. __ (Apr. 22, 2026) (discussing the impact of an appropriations rider on military operations). Once lawfully established, however, the military has broad discretion to arrest those who trespass on NDAs, notwithstanding the PCA, in compliance with the usual Fourth Amendment and other legal considerations.

\* \* \* \* \*

In sum, we conclude that the use of military personnel to arrest trespassers just outside of an NDA would not violate the PCA, given the express statutory authorization and the military-purpose of a commander's traditional protective power. Section 2672 does not limit this authority to civilian officers, and there is no independent-military-nexus requirement.

WILLIAM D. HYDE, JR.
*Deputy Assistant Attorney General*
*Office of Legal Counsel*